UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
───────────────────────────────────X

IRENE SORTO-ROMERO,

                    Plaintiff,

                                                    **OPINION & ORDER**
                                                    05-CV-5172 (SJF) (AKT)

          -against-

DELTA INTERNATIONAL MACHINERY CORP.,

                    Defendant.
───────────────────────────────────X
FEUERSTEIN, J.

I.      Introduction

          On June 10, 2005, plaintiff Irene Sorto-Romero ("Plaintiff" or "Sorto-Romero")

commenced this products liability action against defendant Delta International Machinery Corp.

("Defendant" or "Delta"), in New York State Supreme Court, County of Nassau.   On November

4, 2005, Defendant timely removed the case to this Court pursuant to 28 U.S.C. § 1332.

Defendant now moves for summary judgment pursuant to Fed. R. Civ. P. 56.  For the reasons set

forth below, Defendant's motion is granted in part and denied in part.

II.     Facts[1]

          A.      The Product

          The product at issue is a Delta 2-Speed Heavy Duty Wood Shaper, Model No. 43-375,

manufactured by Delta in 1988.  A wood shaper is a router (i.e., a woodworking tool used to

───────────────────────

[1]   The facts are derived from Defendant's statement of material facts pursuant to Local Rule 56.1 and the
accompanying affidavits and other evidentiary material filed in support of Defendant's motion for summary
judgment, as well as Plaintiff's statement of disputed material facts and the accompanying evidentiary material filed
in response to the motion. The facts are undisputed unless otherwise indicated.

hollow out an area in the face of a piece of wood) on a table, and is generally classified as an embellishment tool, the primary function of which is to put decorative edges on wood. Wood shapers have a vertical spindle that rotates in either a clockwise or counterclockwise direction, upon which different sized cutting blades, or "cutters," can be attached.[2]

The shaper had a split-style fence guard consisting of two separate metal plates, covered by a wood facade, that straddled the spindle and cutter. After a cutter is mounted on the spindle, the fence halves can be adjusted to create an opening just large enough to clear the cutter and used to guide, or introduce, the piece of wood into the cutter and move it past the cutter. The fence guard protects approximately two-thirds (2/3) of the cutter and is designed to prevent inadvertent contact with the cutter.

Originally, the shaper also came with a "Safeguard II" spindle guard, which was a colored plastic disc placed on the spindle above the cutter, with a diameter in excess of that of the cutter. The spindle guard provided a visual guide to also prevent inadvertent contact with the rotating cutter. The spindle guard could be installed/removed by loosening the spindle nut. The shaper can be operated with the spindle guard removed.

Sorto-Romeo used two (2) identical Delta wood shapers owned by his employer, the Walt Whitman Fence Company ("Walt Whitman"), to create fence components. He used these two (2) machines on a daily basis and does not know which shaper he was using at the time of his accident. The shapers were purchased by Walt Whitman from another business in used condition with a fence guard assembly but without the spindle guard. Deposition of Walt Drechsler, dated July 6, 2006 ("Drechsler Dep."), at 20-22. Walt Whitman also created custom-made wooden

[2] It is not clear if the cutter that Sorto-Romero was using at the time of his accident was purchased from Delta.

2

guards fabricated specifically for each type of shaper operation it performed.

As originally sold, the shaper came with an Instruction Manual, which contained safety instructions for the shaper, including a warning that the shaper was not to be used without the guards in place. The shaper also came with a "Safety First" placard in English. A warning label, also in English, is riveted to the shaper at knee height near the wheel used to angle the blade and does not contain all warnings on the safety placard.

B.    The Accident

Sorto-Romero is a native of El Salvador. The accident took place at Walt Whitman's headquarters in Melville, New York, where Sorto-Romero had been employed for over three (3) years. Walt Drechsler ("Drechsler") is the president of Walt Whitman.

Although Sorto-Romero did not change the blades in the shaper, he had been trained to use the machine including "how to cut the pieces of wood . . . [and] how to raise the blade or lower the blade," as well as "everything else that needed to be done." Deposition of Irene Sorto-Romero, dated June 9, 2006 ("Pl. Dep."), at 38-39.

Sorto-Romero's supervisor instructed him in the use of the machine and told him to always "be careful" when working on the wood shaper. Id. at 40. Asked if, prior to the date of his accident, he was aware that, if his hand came into contact with the blade he would be cut, Sorto-Romero responded: "Yes, of course, that is always on our minds. We were afraid cutting the wood [sic] because without protection you can always cut yourself." Id. 41-42.

The day before his accident Sorto-Romero was given an assignment to fabricate two hundred (200) "cookies," which are diamond-shaped wooden ornaments which are placed on a fence section as decoration. After receiving the assignment, Sorto-Romero fabricated

3

approximately twenty five (25) before the accident occurred, as follows: First, either Sorto-Romero or co-worker, Miguel, used a hand-held Skil Saw to cut an eight (8) foot long board/plank into either four (4) or five (5) separate pieces.  Id. at 43-44, 46-47.  With the shaper running, Sorto-Romero would hold the section of wood against the two wood guides (i.e., fence guard); the cutting blade is located in between these wood guides.  Id. at 81-82, 84. Sorto-Romero then would hold the board with both hands, continually applying pressure, and pushing the board from right to left.  Id. at 89-90.

On the date of the accident, Sorto-Romero's right hand was to the right of the cutter, pushing the board forward, while his left hand was closer to the cutter, with his thumb pressing against the side of the board and his ring and pinkie finger curled as "they couldn't be straight." Id. at 91-92, 94-96.  While pulling the board away from the blade with his left hand, the board broke and his right index finger made contact with the cutter, severing it.  Sorto-Romero testified that "this was the very first day that [he] ever made cookies at Walt Whitman Fence Co."  Id. at 74, 116.

Shown a "diamond cookie" at his deposition, Drechsler confirmed that there was a Walt Whitman fabricated wooden guard designed specifically for this type of cookie fabrication operation, "to keep someone's hands away from the blade . . . and to secure the board as it's . . . pushed along the back board."  Drechsler Dep. at 34-35.  When asked if he ever recalled a meeting or a conversation among the employees of Walt Whitman about guards for the cutter itself, Mr. Drechsler replied: "Absolutely, every day . . . and they are implemented, too.  Before they cut a piece of wood, there is a guard that goes over the blade."  Id. at 29.  Drechsler also testified that he personally instructed workers that they were not to use the shaper without the

fabricated guard. Id. at 38. Since Sorto-Romero could not speak English, Drechsler testified that he instructed his foreman Alberto Cruz Lopez ("Lopez") to convey the instructions to Sorto-Romero in Spanish. Id. at 38-39.

Lopez had fabricated the guard "[t]o be safety," or, "in order to keep somebody's hand from going underneath it into the blade." Deposition of Alberto Cruz Lopez, dated July 6, 2006 ("Lopez Dep."), at 33-34, 37 . Prior to the date of Sorto-Romero's accident, Lopez demonstrated to him how to fabricate cookies, with the guard in place, "[a] number of times," and explained to him "many times" why the guard had to be on the machine when shaping wood. Id. at 35-37.

According to Lopez, when Sorto-Romero trained other workers on the shaper prior to the date of his accident, he also instructed the workers that the machine was not to be used unless a guard was in place. Id. at 49.

III.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the nonmoving party based on that fact. Id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The trial court is required to construe the evidence in the light most favorable to the

nonmoving party, and draw all reasonable inferences in its favor.  Id. at 252; Cifarelli v. Vill. of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

In determining a summary judgment motion, a court may first need to determine the admissibility of expert testimony.  See Raskin v. Wyatt Company, 125 F.3d 55, 66 (2d Cir. 1997). Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits submitted in support of and in opposition to a summary judgment motion "set forth such facts as would be admissible in evidence."  Therefore, "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," and "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin, 125 F.3d at 66.

IV.     Defendant's Daubert Challenge

In support of its motion, Defendant asserts that the testimony of Plaintiff's expert witness, Dr. Irving U. Ojalvo ("Ojalvo"), is inadmissible and therefore, his expert report should be stricken and he should be precluded from testifying.  The Court agrees.

        1.      Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In Daubert. v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 597 (1993), the

Supreme Court held that the determination of admissibility is a question of law. First, the trial judge must make an initial determination as to whether the proposed witness qualifies as an expert. See Nimely v. City of New York, 414 F.3d 381, 396 n.11 (2d Cir. 2005). If the proposed witness qualifies as an expert, the trial judge then has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597-598.

The objective of the "gatekeeping" requirement of Daubert and Rule 702 is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). A trial judge's gatekeeping obligation applies not only to testimony based on "scientific" knowledge, but also to testimony based on "technical" or "other specialized" knowledge. Id. at 141. The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 593 n.10. In determining the qualification of experts and the admissibility of their testimony, the trial court has broad discretion, see Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 81 (2d Cir. 1997); Boucher v. United States Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996), although "[r]ejection of expert testimony, however, is still the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system," Figueroa v. Boston Scientific Corp., 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003) (internal citations and quotations omitted).

Since Defendant apparently concedes that Ojalvo possesses the requisite knowledge and experience to be qualified as an expert, and that his opinion, if reliable, would be relevant, the

Court will address only the reliability of his opinion.

The Supreme Court has emphasized that the test for reliability is "flexible." However, there are several factors that a court may consider when determining whether expert testimony is reliable: (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a high known or potential rate of error; and (4) whether it is generally accepted in the relevant scientific community. Daubert, 509 U.S. at 593-94.

"A district court should consider the Daubert factors where they are reasonable measures of the reliability of expert testimony; the list of factors neither necessarily nor exclusively applies to all experts or in every case." Zaremba v. General Motors Corp., 360 F.3d 355, 358 (2d Cir. 2004) (internal citations and quotations omitted). The Supreme Court has made it clear that "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Kumho Tire, 526 U.S. at 153.

Expert testimony should be excluded if it is "speculative or conjectural," or if it is based on assumptions that are "'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.'" Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (quoting Shatkin v. McDonnell Douglas Corp., 727 F.2d 202, 208 (2d Cir. 1984)). An expert's opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert," for a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

2.      Ojalvo's Proposed Testimony

Ojalvo's theories of liability are set forth in his "Wood Shaper Accident Investigation

Report." ("Ojalvo Rep."), in which he states that the subject shaper was defectively designed,

because it does not have an "interlock."  In this regard, Ojalvo wrote as follows:

> This tool was being used *without* the spindle guard . . . or any similar guard, in place at
> the time of Mr. Sorto's accident.  Had there been a guard . . . one that covered the cutting
> tool and that was electrically interlocked with the machine's power, it would have served
> to prevent the subject incident.  This is true even though Mr. Sorto's work-piece fractured
> while it was being machined. Granted that it would have been very difficult to incorporate
> such an interlock with the spindle guard that was provided with this machine, a guard that
> covered the cutting tool and spindle could have accommodated an interlock, together with
> an electric restart solenoid.  Such a guard, with interlock capability, would have prevented
> machine operation unless it was in place and so would have avoided this accident.

Ojalvo Rep. at 5.

At his deposition, Ojalvo was asked to explain what he meant when he stated in his report

that "it would have been very difficult to incorporate such an interlock with a spindle guard that

was provided with this machine," to which he responded as follows:

> Well, the spindle guard sits on a rotating spindle.  The interlock is supposed to alert you
> to the fact that the guard is not in place, so you would have to have some kind of wiring
> that was rotating with the spindle and then you would have to have some kind of a brush
> connection to those particular to that particular wiring.  So essentially you are trying to
> put some kind of microswitch, if you will, on a rotating member and it could be done, but
> it would be difficult to do.

Deposition of Dr. Irving J. Ojalvo, dated Oct. 12-13, 2006 ("Ojalvo Dep."), at 151.

When asked if he had an opinion as to whether it was feasible to incorporate such an

interlock for the wood shaper's guard into the subject wood shaper, Ojalvo replied: "I haven't

arrived at that yet." Id. at 108.

At his deposition Ojalvo conceded that: 1) he has never owned or used a wood shaper similar to the one involved in this matter; 2) this is his first analysis of a wood shaper; 3) he has never developed nor constructed an interlock system for a wood shaper; and 4) the subject wood shaper complied with all applicable American National Standards Institute standards. Id. at 81, 147-148, 151.

Ojalvo's report also stated that the shaper lacked proper warnings because the instruction manual was deficient and the warning label was inconspicuously located and in small print. Ojalvo Rep. at 5-6.

With reference to the warning label, Ojalvo wrote:

A 5 X 5½ inch warning label is located under the overhang of the table at thigh height and near the spindle height adjustment (see Figure 11). It contains 12 warnings, in 1/10 inch letters, that include among others: "4. Do Not Operate Without Guards In Place" and "7. Keep fingers Away From Rotating Cutter and Use Push Sticks Or special Fixtures When Possible". These warnings might have helped avoid this accident if they were more prominently placed and if the lettering was larger. However, as it existed, the label was more likely to go unread by all but the most cautious of possible users, when the arbor height need adjustment. [sic]

Ojalvo Rep. at 6. Ojalvo testified that the warning could have been placed on the table top itself, "toward the backside when you aren't sliding any work" or attached to the machine in such a way as to be visible to the operator from where he was standing. Ojalvo Dep. at 110-111. He also stated:

Another possibility would be to create a surface some wear [sic] out of the way toward the rear that stuck up and put it on that . . . Build some kind of an extension at the back of

the table that would be readily visible to the operator. Construct it, fabricate it, include it . . . Just have something up at a tilted not 90 degree angle . . .

Id.  Ojalvo 1) has never designed, or even seen, a warning label of this type on any shaper machine; 2) is unaware of any standard which requires and/or recommends that such a warning device be installed; and 3) is not aware of any peer study of whether this is a desirable and/or feasible option.  Id. at 111-113.  Ojalvo also: 1) does not know of any manufacturer of a shaper who places a warning label on top of the tabletop itself; and 2) knows of no standard that recommends putting a warning on top of the table itself.  Id. at 112.

With reference to the instruction manual, Ojalvo wrote:

The major deficiency with the subject machine is its Instruction Manual that contains a set of 10 (specific) " . . . safety rules for wood shapers" (see Figure 8).  These rules, in turn, contain 6 figures associated with rules 5 through 8, *none* of which show the spindle guard in place while using the wood shaper.  Additionally, there are similar figures on Page 9 and 10 of the manual (see Figures 9 and 10) that also do not show the spindle guard in use while performing router operations.

Ojalvo Rep. at 5 (emphasis in original).  Ojalvo also noted that the instruction manual was deficient, in that, "[it] tells very little regarding what the machine is primarily designed to do (i.e. put shaped, finished edging on primarily straight, or smoothly curved, edges of wood)."  Id. at 6. Ojalvo concluded that:

[T]he Instruction Manual provided was deficient in two ways, i.e., it did not adequately instruct the user on what the machine was intended to do, nor did it show figures with the provided guard in use during machine operations.  Thus, it was not surprising that the incident machine was not set up properly, with the spindle guard provided, at the time of Mr. Sorto's accident.

Id. at 7.

  3.  Application - Design Defect

 Ojalvo's expert testimony is based on his training and experience in the field of engineering, and engineering is a discipline that is based on scientific principles and theories. See Kumho, 526 U.S. 137. Therefore, it is proper to subject Ojalvo's opinions to scrutiny pursuant to Daubert. As discussed below, Ojalvo's testimony fails to meet the test for reliability outlined in Daubert

  a.  Testing

 In analyzing the reliability of an expert's testimony, the "key question" is "whether it can be (and has been) tested." Daubert, 509 U.S. at 593 (alteration in original). "The presence of this factor in a design defect case also ensures that the focus of the jury's deliberation is on whether the manufacturer could have designed a safer product, not on whether an expert's proposed but untested hypothesis might bear fruit." Colon ex rel. Molina v. BIC USA, Inc., 199 F. Supp.2d 53, 77 (S.D.N.Y. 2001). "Courts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested." Kass v. West Bend Co., No. 02-CV-3791, 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004) (citations omitted), aff'd, 158 Fed. Appx. 352 (2d Cir. 2005).

 In Brooks v. Outboard Marine Corp., the plaintiff's expert proposed to testify about alternative designs that were untested and untried and had never been put into application by any competitive manufacturer, or by the expert himself. 234 F.3d 89 (2d Cir. 2000). The Second Circuit held that "[t]he failure to test a theory . . . can justify a trial court's exclusion of the

12

expert's testimony." Id. at 92. See Zaremba, 360 F.3d at 359 (expert offered no tests, models, calculations or drawings to illustrate that hypothetical alternative design would result in better performance of automobile). See also Colon, 199 F. Supp. 2d at 77 (excluding the testimony of an expert who "has not developed or tested prototypes of lighters embodying his alternative designs").

Here, as in Brooks, the expert did not develop or test prototypes of alternatives that he recommends, nor did he create models or drawings, leading to the conclusion that his opinion is based on speculation.

Plaintiff contends that Ojalvo was not required to test or develop prototypes because he previously constructed an interlock system for a table saw and "each product is mounted with a blade that is used to shape and/or cut wood." Pl.'s Opp. Mem at 6.

However, there is no evidence that these machines are alike except insofar as each employs a mounted blade to cut wood. In fact, the shaper utilizes a vertically mounted spindle employing horizontally mounted cutters, while a table saw utilizes a horizontally mounted spindle employing a vertically mounted saw blade. Accordingly, the fact that Ojalvo tested one machine does not establish the utility of the design he proposes for the machine at issue.

b. General Acceptance

Engineering is a field of applied science. Kumho, 526 U.S. at 148. It relies on the scientific method, which calls for the formulation of a hypothesis and subjecting the hypothesis to tests designed to confirm or rebut the hypothesis. See Daubert, 509 U.S. at 593. Ojalvo's hypothesis was that a wood shaper with a spindle guard with an electric interlock, which would have prevented operation unless the spindle guard was in place, would have prevented Plaintiff's

injuries. However, Ojalvo did not test his hypothesis and conceded that "it would have been very difficult to incorporate such an interlock with a spindle guard that was provided with this machine," Ojalvo Rep. at 5. As Ojalvo established neither the feasibility of his hypothesis nor what impact it would have on the utility of the original design, his conclusions appear to be unsupported by the rigorous examination associated with generally accepted protocols, calling into question the reliability of his conclusions. See Rypkema v. Time Mfg. Co., 263 F. Supp. 2d 687, 693 (S.D.N.Y. 2003) ("[T]o advance a reliable hypothesis, an expert is required to ascertain feasibility, to test alternative designs, and to address the engineering factors and tradeoffs that go into the design of a product for distribution in the marketplace.")

Plaintiff argues that Ojalvo's methodology is reliable because his opinions are based upon Defendant's own designs. Plaintiff contends that Ojalvo had "seen a safer guard [] on a Delta shaper." Pl.'s Op. Mem. at 5. The totality of the proof underlying this assertion consists of the following testimony:

A:      . . . I think [the Shaper] should have had safer guarding than existed.
Q:      What guarding are you referring to?
A:      Something like a cover guard that would cover the entire spindle …
Q:      Have you seen a cover guard that you mentioned?
A:       I have . . .
Q:      On a Delta Shaper . . .
A:      . . . I have the user manual . . . it shows a cover guard on a Delta Shaper.

Ojalvo Dep. at 108-09. At the time of his accident, Plaintiff was operating the shaper without the spindle guard. According to Ojalvo, Plaintiff's accident would never have occurred, had the spindle guard been in place. There is, however, no evidence in the record that Defendant, or, any other company has ever designed a shaper guard incorporating an "electric interlock."

14

Accordingly, Plaintiff's argument that Ojalvo's methodology is reliable because his opinions are based upon Defendant's own designs lacks merit.

        c.        Peer Review and Error Rate

Whether or not the methodology and conclusions of the proffered evidence have been subject to peer review and publication can assist in assessing the reliability of the evidence because the "scrutiny of the scientific [or technical] community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." Daubert, 509 U.S. at 593 (citation omitted). Ojalvo has not written or published any articles describing the theories he advances in this case and his proposed alternative design has not been reviewed by colleagues in the engineering community.

Moreover, since Ojalvo has not tested a prototype of his design, tested a product in the marketplace that embodies his design, or reviewed test results performed by others on his proposed designs, the error rate factor cannot be considered.

Thus, Ojalvo's testimony does not satisfy any of the factors in Daubert: testing, general acceptance, peer review, or error rate. See Colon, 199 F. Supp. 2d at 79 (excluding testimony of expert where, *inter alia*, none of the Daubert factors were satisfied).

        d.        Other Indicia

Defendant contends that the Daubert factors are irrelevant to Ojalvo's testimony because his testimony is based on his experience or his training, as opposed to a methodology or technique. See Pl.'s Op. Mem. at 3-4. However, an expert basing his opinion solely on experience "must do more than aver conclusorily that his experience led to his opinion." Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001). "[I]f the witness

is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it." Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005) (quotations and citation omitted). See id. ("Being an expert does not lessen the burden one has in rebutting a motion for summary judgment.").

While Plaintiff asserts that Ojalvo's testimony is based on "years of accumulated learning and insight," see Pl.'s Opp. Mem at 4, he did not provide specifics to support his contention.

In sum, Plaintiff has not established the admissibility of Ojalvo's testimony as to his design defect claim by a preponderance of the evidence. See Daubert, 509 U.S. at 593 n.10. Accordingly, Defendant's motion to preclude Ojalvo's testimony is granted, and the Court will not consider Ojalvo's report in resolving Defendant's motion for summary judgment.

4.      Application - Failure to Warn

Defendant argues that Plaintiff cannot prove that Ojalvo's testimony is reliable with respect to his failure to warn claim. Defs. Mem. Supp. Summ. J. at 21. Plaintiff does not respond to Defendant's argument in his memorandum in opposition, confining his defense of Ojalvo to his proposed testimony on the design defect claim.

Accordingly, Plaintiff's claim that Ojalvo's testimony is reliable as to his failure to warn claim is "abandoned by virtue of his failure to address [it] in his memorandum responding to [D]efendant['s] summary judgment motion." DeVito v. Barrant, No. 03-CV-1927, 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (citing Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003). See Dineen v. Stramka, 228 F. Supp.2d 447, 454 (S.D.N.Y. 2002)

(finding that plaintiff's failure to address claims in opposition papers "enabl[es] the Court to conclude that [plaintiff] has abandoned them"); Anti-Monopoly, Inc. v. Hasbro, Inc., 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) (holding that plaintiff's failure to provide any argument opposing defendant's motion "provides an independent basis for dismissal" and "constitutes abandonment of the issue"), aff'd, 130 F.3d 1101 (2d Cir. 1997). See also Local Civ. Rule 7.1 ("[A]ll oppositions [to motions] shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion. . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default.").

V.     Determination of the Motion for Summary Judgment

A.     New York Products Liability Law

"A manufacturer who places into the stream of commerce a defective product which causes injury may be held strictly liable."  Amatulli v. Delhi Const. Corp., 77 N.Y.2d 525, 532 (1991).  Under New York law, there are three (3) distinct claims for strict products liability: 1) a design defect, which results when the product as designed is unreasonably dangerous for its intended use; 2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm; and 3) a manufacturing defect, which results when a product that is ordinarily safe is rendered dangerous by a mistake in manufacturing, such that the defective product causes harm.[3]  See McCarthy v. Olin Corp., 119 F.3d 148, 154 (2d Cir. 1997).

---

[3] Plaintiff has withdrawn his manufacturing defect claim.  See Pl.'s Rule 56.1 Counter Statement of Material Fact ¶¶ 15-16.

1.     Design Defect[4]

To prevail on a theory of improper design, a plaintiff must present evidence that: 1) the product as designed posed a substantial likelihood of harm; 2) it was feasible to design the product in a safer manner; and 3) the defective design was a substantial factor in causing plaintiff's injury. See Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107-08 (1983). The first two (2) prongs are often referred to as the risk-utility balancing test and are used to determine whether a product is defective or "unreasonably dangerous." See Anderson v. Hedstrom Corp., 76 F. Supp. 2d 422, 454 (S.D.N.Y. 1999) (citing Cover v. Cohen, 61 N.Y.2d 261, 266 (1984)).

Plaintiff's design defect claim cannot proceed without expert testimony and Plaintiff does not argue to the contrary. In order to establish that an alternative design would have permitted Plaintiff to avoid injury, he must present an opinion from a person with specific technical and scientific knowledge beyond the ken of an average person. Without such evidence, the jury cannot fairly decide the issue. Ojalvo's testimony is not admissible as "expert testimony" and therefore, this claim fails as a matter of law and Defendant is entitled to summary judgment.

In any event, to the extent that Ojalvo's testimony was predicated on his opinion that the shaper should have been designed with an interlock which would have prevented the motor from starting if the blade guard was off, "[t]his theory of liability was explicitly rejected as a matter of law in David v. Makita, U.S.A., 649 N.Y.S.2d 149 (App. Div. 1st Dep't. 1996), and implicitly rejected in Banks v. Makita, U.S.A., 641 N.Y.S.2d 875 (App. Div. 2d Dep't. 1996)." Giunta v. Delta Intern. Machinery, 751 N.Y.S.2d 512, 514 (App. Div. 2d Dep't. 2002) (theory of liability

---

[4] There is no difference between the *prima facie* elements of a design defect sounding in negligence and one sounding in strict products liability. Denny v. Ford Motor Co., 87 N.Y.2d 248, 258 (1995).

rejected where plaintiffs' expert testified that the table saw should have been designed with an interlock which would have prevented the motor from starting if the blade guard was off). See Patino v. Lockformer Co., Inc., 757 N.Y.S.2d 107, 109 (App. Div. 2d Dep't. 2002) ("Despite the plaintiffs' assertion to the contrary, the absence of an interlock device is an insufficient theory of liability as a matter of law." (citing Giunta, 751 N.Y.S.2d at 512)).

2. Failure to Warn[5]

Under New York Law, a plaintiff may assert that a product is defective because the manufacturer failed to provide adequate warnings regarding the risks and dangers associated with the use, or foreseeable misuse, of its product. Urena v. Biro Mfg. Co., 114 F.3d 359, 365-366 (2d Cir. 1997). A defendant is liable if the plaintiff can establish that the duty to warn was breached and that the failure to warn was a substantial or proximate cause of the injury. See Burke v. Spartanics, Ltd., 252 F.3d 131, 139 (2d Cir. 2001) (quotation omitted). However, "[a] manufacturer does not have a duty to warn of a danger associated with a reasonably foreseeable misuse when that danger is 'readily discernible' or the 'injured party is already aware of the specific hazard.'" Arbaiza v. Delta International Machinery Corp., No. 96-CV-1224, 1998 WL 846773, at *6 (E.D.N.Y. Oct. 5, 1998) (quoting and citing Baptiste v. Northfield Foundry & Machine, 584 N.Y.S.2d 221, 223 (App. Div. 3rd Dep't. 1992)).

"The adequacy of the instruction or warning is generally a question of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of summary judgment." Urena, 114 F.3d at 366 (citing Beyrle v. Finneron, 606 N.Y.S.2d 465, 466 (App. Div. 4th Dep't.

---

[5] There is no difference between the *prima facie* elements of a failure to warn claim sounding in negligence and one sounding in strict products liability. Martin v. Hacker, 83 N.Y.2d 1, 8 n.1 (1993).

1997)). "There are several important considerations that directly affect the adequacy of a warning, including the location and conspicuousness of the warning and the method in which the warning is communicated to the ultimate user." <u>Anderson</u>, 76 F. Supp. 2d at 440 (citation omitted). "Under New York Law, the jury does not need expert testimony to find a warning inadequate, but may use its own judgment concerning all the circumstances." <u>Billiar v. Minnesota Mining and Mfg. Co.</u>, 623 F .2d 240, 247 (2d Cir. 1980) (citing <u>Rainbow v. Albert Elia Building Co.</u>, 49 373 N.Y.S.2d 928 (App. Div. 4th Dep't. 1975) and <u>Young v. Elmira Transit Mix, Inc.</u>, 383 N.Y.S.2d 729 (App. Div. 4th Dep't. 1976)). As a result, the fact the Ojalvo's testimony is inadmissible does *per se* affect the validity of this claim.

Defendant argues that it was under no duty to warn about the specific dangers to an operator using a shaper without the blade guards, as the dangers were "open and obvious" and known to Defendant. However, while Plaintiff knew that he had to be careful using the shaper, he did not know that it was dangerous to use the shaper without the spindle guard because the spindle guard was apparently never on a machine that he used or for which he received safety information. As a result, at this stage of the litigation, Defendant has failed to prove that it had no duty to warn or that the duty was discharged as a matter of law. <u>See</u> <u>Urena v. Biro Mfg. Co.</u>, 114 F.3d at 366.

The plaintiff in a products liability action premised on inadequate warning must prove that failure to adequately warn of the dangers was a proximate cause of his injuries. <u>See</u>, <u>e.g.</u>, <u>Belling v. Haugh's Pools, Ltd.</u>, 511 N.Y.S.2d 732, 733 (App. Div. 2d Dep't. 1987). To establish proximate cause, an inadequate warning must be a substantial cause of the events leading to the injury. <u>See</u>, <u>e.g.</u>, <u>id</u>. An act cannot be the "substantial cause" if the injury would have occurred regardless of the content of a defendant's warning. <u>Figueroa v. Boston Scientific Corp.</u>, 254 F.

Supp. 2d 361, 370 (S.D.N.Y. 2003).  Here, at the time of the incident, Plaintiff admits that did not

read English and only understood "a little" English.  See Pl. Dep. at 7-8.  The written warnings

and instruction manual were only in English.  Therefore, Plaintiff could not have read or

understood the warning and, as a result, his behavior would have remained unchanged and the

accident still would have occurred.  Gonzalez by Gonzalez v. Morflo Industrs., Inc., 931 F. Supp.

159, 168 (E.D.N.Y. 1996) ("where a warning would not have increased the particular injured

user's awareness of the danger, failing to warn cannot be said to have been the proximate cause of

the accident" (citing Kerr v. Koemm, 557 F. Supp. 283, 286 (S.D.N.Y. 1983))).

     However, in light of Plaintiff's inability to read the warnings, Plaintiff may be able to

prove causation whereby a third party may have conveyed the warning to him.  Indeed,

> [a]t least three New York courts have allowed failure to warn claims to go to a jury under
> the theory that "'if a proper warning had been given, it could have come to the attention of
> officials of plaintiff's employer or perhaps even fellow workers, who could have informed
> plaintiff of what he had not personally read.'" Power v. Crown Controls Corp., 149
> Misc.2d 967, 970, 568 N.Y.S.2d 674 (N.Y. Sup. 1990) (holding worker who had not read
> warnings which were placed on the forklift could recover for manufacturer's failure to
> provide adequate warnings if he could show that adequate warnings would have come to
> the attention of fellow workers or his employer and that they would have informed him of
> those warnings) (rev'd on other grounds, 189 A.D.2d 310, 596 N.Y.S.2d 38 (1993)). See
> also Derienzo v. Trek Bicycle Corp., 376 F. Supp. 2d 537, 570 (S.D.N.Y. 2005) (noting
> that "the 'realities of society'-i.e., the realities of the mountain biking community-might
> have resulted in Plaintiff's friends advising him not to use a Y5 model for jumping, even if
> Plaintiff had not read the warning himself."); Hedstrom, 76 F. Supp. 2d at 445 n. 24
> (noting that a witness to the accident, who testified that she was concerned about how
> plaintiff was using the trampoline but did not say so at the time, might have spoken up had
> an adequate written warning accompanied the product).

Mustafa v. Halkin Tool, Ltd., No. 00-CV-4851, 2007 WL 959704, at *19 (E.D.N.Y. Mar. 29,

2007).  Drechsler claims to have communicated the proper use of the shaper to his employees.  A

jury could find that the information on an adequately labeled shaper that instructed users not to use the shaper without the spindle guard would have been communicated to Plaintiff by his Spanish-speaking co-workers, and that failure to provide such a warning could be seen as a proximate cause of Plaintiff's injuries.  Cf. id. (conveyance theory not viable because there was no evidence that anyone could have actually been able to convey the warning to plaintiff).

A jury may assess the adequacy of a warning, even in the absence of expert testimony.

Billiar, 623 F .2d at 247.  While Ojalvo's testimony is precluded on this issue, see Sec. IV(A)(4), Defendant is not entitled to summary judgment because a material question of fact exists concerning the sufficiency of the warning Plaintiff received.  Where "reasonable minds might disagree as to the extent of [P]laintiff's knowledge of the hazard," the question is one for a jury. Brady v. Dunlop Tire Corp., 711 N.Y.S.2d 633, 633 (App. Div. 3d Dep't. 2000) (citations omitted).  Therefore, Defendant's motion is denied.

C.      Breach of Warranty

Defendant contends that Plaintiff's breach of warranty claim is time-barred.  Defs. Mem. Supp. Summ. J. at 24.  Plaintiff does not respond to this contention in his memorandum in opposition.  Accordingly, the Court dismisses the claim abandoned.  See Sec. IV(A)(4) (collecting cases).

VI.     Conclusion

For the reasons stated above, Defendant's motion to preclude the proposed testimony of Plaintiff's expert is GRANTED and Defendant's motion for summary judgment is GRANTED as to Plaintiff's design defect and breach of warranty claims and DENIED as to Plaintiff's failure to

warn claim.

The parties are directed to appear in Courtroom 1010 at the Central Islip Courthouse, 100 Federal Plaza, Central Islip, New York, on ***Wednesday, October 24, 2007, at 10:15 a.m.*** for a settlement and/or scheduling conference with authority or persons with authority to resolve this action. Further, the parties are directed to engage in good faith settlement negotiations prior to the conference.

IT IS SO ORDERED.


_____/s/_____
Sandra J. Feuerstein
United States District Judge

Dated: September 24, 2007
Central Islip, New York